1  Daniel J. Fazio (SBN: 243475)
   dfazio@winston.com
2  **WINSTON & STRAWN LLP**
   35 West Wacker Drive
3  Chicago, IL 60601-9703
   Tel:   (312) 558-5600
4  Fax:   (312) 558-5700

5  Diana Hughes Leiden (SBN: 267606)
   dhleiden@winston.com
6  Deven Taylor Klee (SBN: 323444)
   dklee@winston.com
7  **WINSTON & STRAWN LLP**
   333 South Grand Avenue
8  Los Angeles, CA 90071-1543
   Tel:   (213) 615-1700
9  Fax:   (213) 615-1750

10 *Attorneys for Plaintiffs* SSI(U.S.) INC. d/b/a SPENCER STUART, SPENCER
   STUART INTERNATIONAL B.V., SPENCER STUART INTERNATIONAL
11 IRELAND, LTD., and LIMITED LIABILITY COMPANY SPENCER STUART
   INTERNATIONAL

12

13               **UNITED STATES DISTRICT COURT**

14    **FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15 SSI(U.S.), INC., a Delaware         Case No.
   corporation, d/b/a SPENCER
16 STUART, SPENCER STUART             **COMPLAINT FOR DAMAGES AND
   INTERNATIONAL B.V., AND           INJUNCTIVE RELIEF**
17 SPENCER STUART
   INTERNATIONAL IRELAND,             1. **MISAPPROPRIATION OF
18 LTD., LIMITED LIABILITY               TRADE SECRETS (18 U.S.C. §
   COMPANY SPENCER STUART               1831 ET SEQ.)**
19 INTERNATIONAL
                                      2. **INTENTIONAL INTERFERENCE
20          Plaintiffs,                  WITH CONTRACTUAL
                                         RELATIONS**
21          v.
                                      3. **INTENTIONAL INTERFERENCE
22 KORN FERRY, a Delaware                WITH PROSPECTIVE
   corporation, and MARAT               ECONOMIC ADVANTAGE**
23 FOOKSON,
                                      4. **NEGLIGENT INTERFERENCE
24          Defendants.                   WITH PROSPECTIVE
                                         ECONOMIC ADVANTAGE**
25
                                      5. **AIDING AND ABETTING
26                                       BREACH OF FIDUCIARY DUTY**

27                                    6. **UNFAIR COMPETITION (BUS. &
                                         PROF. CODE § 17200 ET SEQ.)**
28
                                         **DEMAND FOR JURY TRIAL**

---

1
COMPLAINT

Plaintiffs SSI(U.S.), Inc. d/b/a Spencer Stuart, Spencer Stuart International B.V., Spencer Stuart International Ireland, Ltd., and Limited Liability Company Spencer Stuart International (collectively, "Spencer Stuart"), by and through their undersigned attorneys and for their claims against Defendants Korn Ferry ("Korn Ferry") and Marat Fookson ("Fookson") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.     This dispute arises out of Korn Ferry's unlawful theft of Spencer Stuart's employees, clients, trade secrets, and other confidential and proprietary information to gain an unfair competitive advantage over Spencer Stuart and its other competitors in the Russian market for executive search services, as well as in the global market for executive search, CEO services, Leadership Advisory Services and other service offerings in which Spencer Stuart and Korn Ferry compete globally, including in the United States.

2.     Since opening a Moscow, Russia office in 2014, Spencer Stuart, one of the world's leading executive search firms, has invested millions of dollars in personnel, infrastructure, intellectual property, and other assets to develop a successful brand and business in Russia. By 2020, that investment had paid off; in 2020, Spencer Stuart's Moscow Office achieved significant profitability and had become an integral part of the firm's global strategy, with an established reputation in executive search and a growing presence in Spencer Stuart's CEO Succession and Leadership Advisory Services offerings, among others.

3.     Also in 2020, Korn Ferry evidently decided it wanted to create a presence in the Russian market for executive search, but without the investment and effort that Spencer Stuart had undertaken.  After the CEO of Korn Ferry's overtures to purchase Spencer Stuart were rejected by Spencer Stuart, Defendants hatched a plan to steal Spencer Stuart's Moscow office, including its personnel, clients, trade secrets and other confidential and proprietary information, and with those, the concomitant goodwill that Spencer Stuart had spent years and millions of dollars developing.

4.     The plot was hatched and executed out of Korn Ferry's Los Angeles headquarters, masterminded by its Senior Vice President, Marat Fookson, who lives in Los Angeles County and works in Korn Ferry's Los Angeles headquarters, and who describes himself as the person "responsible for senior level recruiting at [Korn Ferry], globally."

5.     Fookson was aided and abetted and/or directed by Korn Ferry's legal department, headed by global General Counsel Jonathan Kuai, who also lives in Los Angeles County and works in Korn Ferry's Los Angeles headquarters.

6.     In fall 2020, Fookson and Korn Ferry convinced the Managing Partner of Spencer Stuart's Moscow Office, Yaroslav Glazunov ("Glazunov"), to join Korn Ferry and to establish a fully-operating Moscow office for Korn Ferry.   They lured him with a three-year compensation guarantee wildly in excess of any amount that could be justified by Glazunov's production alone.   To guarantee its investment, therefore, Defendants undertook an unlawful course of conduct to improperly take Spencer Stuart's employees and clients and misappropriate Spencer Stuart's trade secrets and other confidential and proprietary information.

7.     Knowing that allowing Glazunov to observe his legal and contractual duties to Spencer Stuart, and observing their legal duties to Spencer Stuart, would provide Spencer Stuart the opportunity to retain the other Moscow office personnel, the Spencer Stuart clients, and the Spencer Stuart trade secrets and other confidential and proprietary information, Defendants induced first Glazunov, and subsequently the other Spencer Stuart Moscow Consultants, to breach their contractual and legal duties to Spencer Stuart by requiring them to aid and abet Defendants in: (i) poaching the other Consultants, associates, and staff—every single employee in Spencer Stuart's Moscow office, save one they deemed redundant; (ii) diverting business opportunities to Korn Ferry; and (iii) stealing Spencer Stuart's trade secrets and other proprietary information for Korn Ferry's use—***all while Glazunov and the other Moscow Consultants remained in the pay and employment of Spencer Stuart***.

8.     To date, Defendants' unlawful scheme has worked.  Using Glazunov and the trade secrets and other confidential and proprietary information he and the other Consultants improperly had transmitted to Korn Ferry, Korn Ferry and Fookson successfully poached nearly the entire Moscow office, had proprietary and trade secret information handed to Korn Ferry that, upon information and belief, Korn Ferry is already using in Russia and elsewhere, and have allowed Korn Ferry to capitalize on business opportunities that were improperly diverted away from Spencer Stuart and to Korn Ferry.  Korn Ferry now publicly boasts having started a search business in Russia using Glazunov and the other Spencer Stuart Moscow Consultants and employees. Tellingly, this office is staffed almost entirely with former Spencer Stuart employees (all of whom Glazunov recruited, at Korn Ferry's behest, while he still worked at Spencer Stuart) and is operating based on the stolen trade secrets and other confidential and proprietary information developed by Spencer Stuart.

9.     By virtue of Defendants' breaches and theft of Spencer Stuart's trade secrets and other confidential and proprietary information, they have stolen the investment that Spencer Stuart has made and the value of the business and goodwill that Spencer Stuart had spent years and millions of dollars building up in Russia.  Korn Ferry's and Fookson's theft has gutted Spencer Stuart of its ability to operate the Moscow Office, and has undermined its competitive advantage in other markets, including the United States, causing millions of dollars in damages.

10.     Korn Ferry's and Fookson's illegal practices, masterminded and orchestrated out of Korn Ferry's Los Angeles headquarters by its Los Angeles-based senior leadership, give rise to Spencer Stuart's claims for misappropriation of trade secrets, intentional interference with contractual relations, intentional and negligent interference with prospective economic advantage, aiding and abetting breach of fiduciary duty, and violations of California's Unfair Competition Law.

## THE PARTIES

11.     Plaintiff SSI(U.S.) Inc. d/b/a/ Spencer Stuart is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.  Spencer Stuart is one of the world's leading global executive search firms, with more than 70 offices in over 30 countries.  Spencer Stuart maintains offices in Los Angeles, San Francisco, and Silicon Valley, California.

12.     Plaintiff Spencer Stuart International B.V. is a private limited company organized and existing under the laws of the Netherlands, with its principal place of business in Amsterdam, the Netherlands.  It is the owner of 99% of the shares in the Charter Capital of Limited Liability Company Spencer Stuart International.

13.     Plaintiff Limited Liability Company Spencer Stuart International is a limited liability company incorporated and existing under the laws of the Russian Federation.

14.     Plaintiff Spencer Stuart International Ireland, Ltd. is a limited company organized and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.

15.     Defendant Korn Ferry is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1900 Avenue of the Stars, Los Angeles, CA 90067.  Its services include executive search, and it has more than 100 offices globally and boasts of serving clients in more than 50 countries. Since 2015, it has owned and operated a subsidiary in Russia known as Hay Group Limited Liability Company, a human resources consultancy.

16.     Defendant Marat Fookson is an individual and resident of Los Angeles County.  He is Senior Vice President of Korn Ferry, is based out of Korn Ferry's Los Angeles headquarters, and describes himself as "responsible for senior level recruiting at [Korn Ferry], globally."

**RELEVANT NON-PARTIES**

17.     Yaroslav Olegovich Glazunov ("Glazunov") is an individual and a resident of Moscow, Russia.  He served as a Consultant and Moscow office head for Spencer Stuart from January 2014 until January 10, 2021, as well as General Director of Limited Liability Company Spencer Stuart International until February 2021.  He now serves as a Senior Client Partner for Korn Ferry.

18.     Margarita Vladimirovna Koshman ("Koshman") is an individual and a resident of Moscow, Russia.  From January 2014 to January 2021, Koshman served as a Consultant in Spencer Stuart's Moscow office under the terms of an employment agreement (the "Koshman Employment Agreement") dated January 15, 2014.  A copy of the Koshman Employment Agreement is attached hereto as Exhibit A.  Koshman now serves as a Senior Client Partner for Korn Ferry.

19.     Anton Vladimirovich Storozhenko ("Storozhenko") is an individual and a resident of Moscow, Russia.  From January 2014 to January 2021, Storozhenko served as a Consultant in Spencer Stuart's Moscow office under the terms of an employment agreement (the "Storozhenko Employment Agreement") dated January 15, 2014.  A copy of the Storozhenko Employment Agreement is attached hereto as Exhibit B. Storozhenko now serves as a Senior Client Partner for Korn Ferry.[1]

**JURISDICTION AND VENUE**

20.     This civil action contains claims for trade secret misappropriation arising under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*.  The Court therefore has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c).

21.     This Court has supplemental jurisdiction over Spencer Stuart's state law claims pursuant to 28 U.S.C. §1367(a).

---

[1] Glazunov, Koshman, and Storozhenko are collectively referred to herein as the "Moscow Consultants."

22.     This Court has personal jurisdiction over Korn Ferry because it has committed and continues to commit acts of misappropriation and other tortious acts in this District by directing the illegal acts described herein from its headquarters, located in this District, which give rise to all of the causes of action asserted herein.  This Court also has personal jurisdiction over Korn Ferry because it has substantial, systematic, and continuous contacts with this District.  Korn Ferry has a regular and established place of business in the State of California and is headquartered in this District.

23.     Defendant Fookson is subject to the personal jurisdiction of this Court because he is domiciled in the State of California.

24.     Venue is proper in this judicial district under the provisions of 28 U.S.C. §1391(b)(1), because all defendants reside in this judicial district and all defendants are residents of the State of California.  Venue is also proper in this judicial district under the provisions of 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and, upon information and belief, a substantial part of the intellectual property that is subject of this action is situated on Korn Ferry computer servers located in this judicial district.

## FACTUAL ALLEGATIONS

### A.     Spencer Stuart's Business

25.     Spencer Stuart is one of the world's leading global executive search and leadership consulting firms.  The firm specializes in assisting its clients in finding and assessing top-level candidates for chief executive, board director and senior executive roles.  It has been a premier executive search and leadership advisory firm for over 60 years.  Spencer Stuart provides insight that organizations around the world rely on to select and develop executives, set new leaders up for success, optimize team effectiveness, and evaluate and evolve their organizational cultures.

26.     Along with its highly skilled and trained personnel, Spencer Stuart's leadership assessment methodologies, platforms and technologies are critical components of its business and contribute significantly to its success and competitive

edge in the industry.  These assessment methodologies, platforms and technologies, together with the research data, reports and institutional know-how related to them, are the intellectual property of, and proprietary information belonging to, Spencer Stuart.

27.    Because disclosure of any of this intellectual property or proprietary information, including trade secrets (collectively, "Confidential Information") to the public or to Spencer Stuart's competitors would greatly harm Spencer Stuart's business, Spencer Stuart takes careful and reasonable measures in accordance with normal industry practice to maintain the secrecy and confidentiality of such information and to protect it from disclosure.  Among other protective measures, Spencer Stuart requires employees who have access to any of this Confidential Information to execute confidentiality and/or non-disclosure agreements, and it maintains a comprehensive firm-wide code of conduct, requiring Spencer Stuart employees to treat such Confidential Information with the strictest level of confidentiality, not only during an individual's employment but also after the individual's employment has terminated. Spencer Stuart also maintains secure computer servers to store its Confidential Information, requires password protection of its systems and hardware, and utilizes sophisticated firmware protection software and devices to track the movement of its Confidential Information, among other measures.

**B.    Spencer Stuart's Moscow Office and Its Personnel and Trade Secrets**

28.    In 2014, as part of a global expansion, Spencer Stuart opened the Moscow Office, hiring Glazunov, Koshman, and Storozhenko as Consultants.  Since that time, Spencer Stuart spent millions of dollars investing in the Moscow Office.  These investments have included building a team of associates, analysts, accountants, executive assistants and other personnel on the ground in Moscow to assist the Consultants in developing and executing upon business opportunities; funding outside business development opportunities for Glazunov and the other Consultants; significant investment in information technology infrastructure; and the development of highly-valuable intellectual property, including trade secrets, utilized by Spencer Stuart to give

it a competitive advantage in the executive search market in Russia and the markets within the Commonwealth of Independent States served by Spencer Stuart's Moscow office, as well as in the other service offerings of Spencer Stuart, including CEO Succession and Leadership Advisory Services.

29.    In hiring Glazunov to serve as a Managing Partner at the Moscow Office, Spencer Stuart appointed Glazunov to be General Director ("GD") of its Russian business.  In accepting the position of Managing Partner and GD, Glazunov signed an employment agreement (the "2014 Glazunov Employment Agreement") with Spencer Stuart, dated December 19, 2014.  A copy of this agreement is attached to this Complaint as Exhibit C.  As GD, Glazunov had heightened duties of loyalty and fiduciary duties to Spencer Stuart under Russian law that existed independent of his Employment Agreement.

30.    In his capacity as GD, Glazunov subsequently entered into a later employment agreement (the "2017 Glazunov Employment Agreement") that was in effect through his departure in January 2021.  A copy of the 2017 Glazunov Employment Agreement is attached to this Complaint as Exhibit D.

31.    In signing the 2017 Glazunov Employment Agreement, Glazunov agreed to several provisions proscribing a duty of loyalty to Spencer Stuart, which supplemented the legal duties of loyalty that Glazunov owed Spencer Stuart under Russian law in his capacity as GD.

32.    For example, Section 2.1.3 states that Glazunov agreed to "[b]e loyal to the Company and fulfil all of his duties in good faith, applying all of his professional skills, using all of his abilities in the interest of the Company. The Employee shall not do anything which could cause damage to the Company or its goodwill or reputation. The Employee shall take all necessary reasonable actions to protect the Company's property and property interests from theft, misappropriation, harm or damage and shall be responsible for any property of the Company under his control." Ex. D at 2.

33.    In Section 2.1.10, Glazunov agreed to "[n]ot disclose any information on

the activities of the Company (with the exception of information that cannot be treated as an official secret or trade secret under the laws of the Russian Federation) that has become available to him in the course of his duties." *Id*. at 3.

34.    The Employment Agreement contains several other provisions in which Glazunov agreed to not breach his duty of loyalty to Spencer Stuart and to safeguard Spencer Stuart's Confidential Information and trade secrets. *See*, *e.g.*, Section 2.1.13, 2.1.14, 12.1, 15.1-17.3.

35.    At the same time it hired Glazunov, Spencer Stuart also hired Koshman and Storozhenko to serve as Consultants in the Moscow office, under Glazunov, pursuant to the Koshman Employment Agreement and the Storozhenko Employment Agreement, respectively.

36.    Among other provisions, the Koshman Employment Agreement and the Storozhenko Employment Agreement both provided that Koshman and Storozhenko were obligated during their employment to remain loyal to Spencer Stuart and not to divert employees, clients, or other assets away from Spencer Stuart and to its competitors. For example, Section 3.6 of their agreements provided:

> 3.6   The Employee agrees to be, during the term of this Agreement, loyal to the interests of the Employer, so that all actions connected to the carrying out of duties and responsibilities under this Agreement will be conducted by the Employee exclusively in the interests of the Employer, rather than out of personal interest or interests of third parties.

Exs. A & B at 2-3.

37.    Likewise, the Koshman Employment Agreement and the Storozhenko Employment Agreement both provided that Koshman and Storozhenko were obligated not to use, disclose, or transmit Spencer Stuart's Confidential Information and trade secrets. For example, Sections 11.1 and 11.3 of their agreements provide:

> 11.1  The employee is obligated to comply with the trade secrets regime

established by the Employer with respect to the Employer's information constituting trade secrets (know-how), including trade secrets (know-how) created by the Employee in connection with performing the Employee's employment duties or specific assignments from the Employer.

11.3  The Employee undertakes to maintain confidentiality (secrecy) in respect to the Know-how, not to disclose the Know-how to third parties, not to use any such Know-how in any way which is not specifically authorized hereunder or otherwise by the Employer (including for the Employee's own purposes or benefits) and to endeavor to prevent unauthorized disclosure of such Know-how to third parties.

Exs. A & B at 6.

38.    At all times throughout their employment with Spencer Stuart, Glazunov, Storozhenko, and Koshman were also under legal duties under Russian law not to misappropriate Spencer Stuart's trade secrets.

39.    Spencer Stuart's trade secrets are comprised of proprietary methods and processes that Spencer Stuart uses in the US and throughout the world to build, design, and execute upon Spencer Stuart's product offerings, and are embodied in a number of documents and compilations that, for example, detail Spencer Stuart's internal, confidential, and proprietary methodologies for developing and executing upon business in its CEO Succession, Leadership Advisory, and Executive Search practices, among others.

40.    As part of the Spencer Stuart worldwide organization, the Moscow Office had access to Spencer Stuart's Confidential Information and trade secrets throughout the world, including both trade secrets it could access through the firm's proprietary database, as well as trade secrets that Moscow Office personnel directly solicited and obtained from other Spencer Stuart Consultants throughout the world, including the

United States.

41.     For example, without knowing that the Moscow Consultants were plotting to leave Spencer Stuart to join Korn Ferry, US-based Spencer Stuart personnel had recently shared with Moscow office personnel, at their request, sensitive Spencer Stuart Confidential Information and trade secrets, including detailed data and explanations, and related documentation, including trade secrets, regarding the proprietary methods that Spencer Stuart uses in the US to build and design Spencer Stuart's product offerings.  In the hands of Korn Ferry, this information could be used to quickly replicate Spencer Stuart's offerings and to compete with Spencer Stuart in a variety of CEO advisory offerings, both within and outside Russia, offerings in which Korn Ferry has significantly lagged behind Spencer Stuart.

42.     The Moscow Office personnel also developed trade secrets on behalf of Spencer Stuart, using Spencer Stuart's resources, including trade secret compilations created over the course of years that compiled and analyzed highly-detailed information regarding hundreds of Russian executives and board members. This trade secret information provided Spencer Stuart and the Moscow Office with a significant competitive edge in the Russian executive search market, including over Korn Ferry.

43.     At all relevant times, Spencer Stuart has taken, and continues to take, reasonable steps in accordance with normal industry practice, as described in Paragraph 27 above, to maintain the confidentiality of these and other trade secrets, as it does with respect to all its Confidential Information.

**C.     Korn Ferry and Fookson Recruit Glazunov and Induce Him to Divert Spencer Stuart's Personnel, Clients, and Trade Secrets to It While He Remains Employed With Spencer Stuart**

44.     Korn Ferry had operated a human resources consulting business in Russia since its 2015 acquisition of Hay Group, under its subsidiary Hay Group Limited Liability Company.  Consistent with Russian law, Korn Ferry had a General Director in place for its Russian subsidiary.  Korn Ferry, however, lacked executive search

personnel on the ground in Russia and, therefore, any meaningful executive search presence in Russia, which Korn Ferry viewed as a strategic market for the firm.

45.     Therefore, in or about late summer 2020, Fookson, who himself is a native of Russia and speaks fluent Russian, contacted Glazunov and offered Glazunov a deal. Fookson proposed that Glazunov would be granted guaranteed compensation of millions of dollars per year—far in excess of his then-current Spencer Stuart compensation.  Fookson's proposal was made in exchange for Glazunov joining Korn Ferry and, upon information and belief, ensuring that all of the Spencer Stuart Moscow personnel, clients, and key trade secrets and other Confidential Information would join alongside him.  Korn Ferry would thus use Glazunov as the key to unlock the Spencer Stuart vault, lifting out and replicating Spencer Stuart's entire Russian operation without undertaking the substantial and ongoing investment of time, resources, and risk that Spencer Stuart had undertaken when it launched in Russia in 2014, and without purchasing the Russian business directly from Spencer Stuart, which would have cost Korn Ferry far more money.

46.     By virtue of their theft of Spencer Stuart's Moscow operations, Korn Ferry would further gain access to trade secrets useful for it globally, including in the United States, including trade secrets that would aid it in developing the know-how and methodologies to build out CEO Succession and Leadership Advisory Services practices, two key practice areas in which Spencer Stuart has had a marked competitive advantage over Korn Ferry's fledgling and under-developed offerings in those areas.

47.     In a draft dated September 3, 2020, Korn Ferry delivered a term sheet to Glazunov (the "September 3 Glazunov Term Sheet").  A copy of the September 3 Glazunov Term Sheet, which was authored by Fookson, is attached hereto as Exhibit E. The September 3 Glazunov Term Sheet proposed that Glazunov would start at Korn Ferry on October 1, 2020, and offered Glazunov the following compensation guarantees:

      a.  Base Salary of $250,000 per year; plus

b. Sign-on bonus of $500,000; plus

c. Restricted Share award of $100,000; plus

d. A make-whole bonus of $825,000 for the amount of bonus he would forfeit at Spencer Stuart that year; plus

e. Minimum incentive pay of $1,500,000 for FY21; plus

f. Minimum incentive pay of $1,500,000 for FY22; plus

g. Minimum incentive pay of $1,750,000 for FY23.

48.    In other words, the Korn Ferry offer to Glazunov was for guaranteed minimum compensation of *$6,925,000* for three years' work, giving him average annual guaranteed compensation of more than $2,300,000, which was nearly *double* his average annual Spencer Stuart compensation over the prior three years.

49.    In drafts also dated September 3, 2020, Korn Ferry delivered draft term sheets for Storozhenko and Koshman, *to Glazunov*.  Copies of the Storozhenko and Koshman draft terms sheets, which were also authored by Fookson, are attached hereto as Exhibits F and G.

50.    The September 3 Storozhenko Term Sheet provided that Storozhenko would start at Korn Ferry on January 11, 2021, and would have guaranteed him the following compensation:

a. $150,000 base salary; plus

b. $250,000 sign-on bonus; plus

c. make-whole bonus of $200,000 for the amount of bonus he would forfeit at Spencer Stuart that year; plus

d. Minimum incentive pay of $500,000 for FY21; plus

e. Minimum incentive pay of $500,000 for FY22; plus

f. Minimum incentive pay of $500,000 for FY23.

51.    The September 3 Koshman Term Sheet provided that Koshman would start at Korn Ferry on January 11, 2021, and would have guaranteed her the following compensation:

a. $150,000 base salary; plus

b. $250,000 sign-on bonus; plus

c. make-whole bonus of $200,000 for the amount of bonus he would forfeit at Spencer Stuart that year; plus

d. Minimum incentive pay of $500,000 for FY21; plus

e. Minimum incentive pay of $500,000 for FY22; plus

f. Minimum incentive pay of $500,000 for FY23.

52.    In drafts dated September 10, 2020, Korn Ferry delivered modified term sheets for Storozhenko and Koshman, again **to Glazunov.**  These modified term sheets for Storozhenko and Koshman, , which are attached hereto as Exhibits H and I, which were also authored by Fookson, reflected negotiation between Glazunov and Fookson, and reduced the guaranteed incentive pay for Storozhenko and Koshman, from $500,000 per year to $400,000 per year, and removed any guarantee whatsoever for FY23.

53.    Upon information and belief, Korn Ferry and Fookson reduced the guarantees in this manner (from $1.5 million to $800,000) at the direction of Glazunov. Glazunov had earlier in 2020 attempted to convince Spencer Stuart senior management to terminate both Storozhenko and Koshman for alleged poor performance, and while he knew that he had to bring Storozhenko and Koshman with him to Korn Ferry in order to properly execute upon his and Korn Ferry's plan to steal Spencer Stuart's Moscow operations, Glazunov did not intend to keep them along with him at Korn Ferry longer than he felt absolutely necessary to complete the illegal scheme.

54.    On September 11, 2020, Glazunov set a meeting with Koshman and Storozhenko, with the subject, "MK, AS, YG – catch up after retreat – plans for 2021 and onwards."  On information and belief, it was at this meeting that Glazunov told Koshman and Storozhenko about the Korn Ferry offers and brought them into Korn Ferry's plot to steal Spencer Stuart's Moscow operations.

55.    On or about September 22, 2020, Korn Ferry delivered to Glazunov a draft

Labour Contract. Among other things, the September 22 draft Labour Contract provided that Glazunov would commence work at Korn Ferry on October 1, 2020. A copy of the September 22 draft Labour Contract is attached to the Complaint as Exhibit J.

56. On or about October 14, 2020 Korn Ferry delivered to Glazunov a revised draft Labour Contract. The October 14 draft Labour Contract, which included mark-ups from Graham Paul of Korn Ferry's legal department, altered Glazunov's start date, from October 1, 2020 to January 11, 2021. This delay in Glazunov's start date would provide Korn Ferry and Glazunov more time to complete the lift-out of Spencer Stuart's trade secrets, personnel, and clients while Glazunov remained on Spencer Stuart payroll and had access to its personnel, systems, and IP. A copy of the October 14 draft Labour Contract, with Graham Paul's edits, is attached to the Complaint as Exhibit K.

57. Also on or about October 14, 2020, Korn Ferry delivered to Glazunov a further contract, authored by its legal department, titled "Side Agreement – Russia.docx" (the "Side Agreement"). The Side Agreement is attached to the Complaint as Exhibit L.

58. The Side Agreement contained a series of agreements entered into between Glazunov and "Korn Ferry (US) of 33 South Sixth Street, Suite 4900, Minneapolis MN 55402, United States." The Agreement purported to be governed by New York law and the parties agreed that any disputes between them arising under the Agreement would be subject to the exclusive jurisdiction of the courts of New York.

59. The Side Agreement more formally memorialized the monetary terms that were in Glazunov's September 3, 2020 Term Sheet, including the *$6,925,000* in guaranteed compensation.

60. Thereafter, Korn Ferry and Glazunov put their unlawful plan into high gear. Having already violated his fiduciary duties as GD by recruiting Storozhenko and Koshman, Glazunov, now having brought Storozhenko and Koshman into Korn Ferry's unlawful scheme, turned his focus on the remainder of Spencer Stuart's Moscow

personnel, its Confidential Information, trade secrets, and clients.

61. First, Glazunov, Storozhenko, and Koshman began the process of exfiltrating Spencer Stuart's trade secrets and other Confidential Information for Korn Ferry's use, both directly and through their executive assistants. For example:

62. On November 26, 2020, Glazunov emailed himself the Moscow Office's Fiscal Year 2021 budget, even though he knew very well by that time that he would not be using this at Spencer Stuart. Instead, it would be useful for Korn Ferry as it worked with Glazunov to budget the Moscow office he was replicating.

63. On November 26, 2020, Glazunov sent himself a draft email containing a list of the employees of the Moscow Office and their purported respective salaries as well as an explanation of how the Moscow Office distributes employee bonuses, all information he was contractually obligated to maintain as confidential. The email was addressed to "Graham." "Graham" refers to Graham Paul, Associate General Counsel, EMEA, for Korn Ferry, who acts with the knowledge and at the direction of his supervisor, Korn Ferry's global General Counsel, Jonathan Kuai. Kuai resides in Los Angeles County and works for Korn Ferry in its Los Angeles headquarters.

64. Glazunov's November 26 email also explicitly referenced "Marat," and refers to Marat and Glazunov having discussed which Spencer Stuart personnel would and would not come to Korn Ferry. "Marat" refers to Defendant Marat Fookson, who also resides in Los Angeles County and works for Korn Ferry in its Los Angeles headquarters. A copy of this email is attached to the Complaint as Exhibit M.

65. On November 27, Glazunov sent himself three emails within less than 30 minutes:

     a. Compensation information for Moscow personnel for the prior two fiscal years;

     b. Non-consultant bonus calculations for the current fiscal year; and

     c. Personal letters and SSI closing success fee letter that contained an overview of specific search assignments performed previously, including

compensation details of placed candidates.

66.    On December 18, Glazunov sent three "model" position specification documents done by others at Spencer Stuart that contained confidential client and candidate information.

67.    For her part, Koshman, beginning in late October 2020, after having her Korn Ferry offer securely in hand and with full knowledge that she was leaving Spencer Stuart, sent to her personal email address at least 47 emails containing Confidential Information and/or trade secrets of Spencer Stuart for Korn Ferry's use, including without limitation a leadership profile report of a candidate relating to ongoing client work, trade secrets related to Spencer Stuart's CEO Succession and Leadership Advisory Services practices, and a complete CEO practice development timeline, that is a competitive advantage of Spencer Stuart over Korn Ferry, interview notes, and reporting line information that would normally be housed on Spencer Stuart's secure servers.  The information that Koshman sent during this period included the following trade secrets:

i.    An internal Leadership Advisory Services process map, detailing Spencer Stuart's internal, proprietary methodologies for developing and executing upon business in the Leadership Advisory Services space, including detailed processes relating to Strategy, Origination, Conversion, and Execution.

ii.    A highly-detailed Internal Talent Assessment PowerPoint, designated "Proprietary and Confidential," detailing Spencer Stuart's internal talent assessment methodologies as applied to clients both inside and outside the Russian market.

iii.    A highly-detailed Leadership Advisory Services PowerPoint, designated "Proprietary and Confidential," detailing Spencer Stuart's Leadership Advisory Services methodologies as applied to clients both inside and outside the Russian market.

1
2
3
4

    iv.   A highly-detailed Executive Assessment for Development PowerPoint, designated "Proprietary and Confidential," detailing Spencer Stuart's Executive Assessment methodologies as applied to clients both inside and outside the Russian market.

5
6
7
8
9

68.    With the foregoing trade secrets, among others, Koshman was taking with her to Korn Ferry information Korn Ferry could use to attempt to replicate service offerings in these service areas where Korn Ferry's offerings were significantly under-developed compared to Spencer Stuart's, not only in Russia, but throughout the world, including in the United States.

10
11
12

69.    Before receiving her Korn Ferry offer, Koshman had not had a practice of sending Spencer Stuart Confidential Information and trade secrets to her personal email address.

13
14
15

70.    Koshman also attempted, on December 21, to send an entire backup of 3,155 contact details linked with Spencer Stuart email to her personal email address but was thwarted in doing so by Spencer Stuart's information system security protocols.

16
17
18
19
20
21
22
23
24
25
26
27
28

71.    Upon information and belief, all of the foregoing Confidential Information and trade secrets were transmitted to and at the direction of and for the benefit of Korn Ferry, both through Fookson from Korn Ferry's Los Angeles headquarters and through Korn Ferry's legal department, as well as by virtue of the fact that Glazunov, Koshman, and Storozhenko were acting in the capacity as agents of Korn Ferry, already having secured employment contracts with Korn Ferry, at the time they engaged in this misappropriation.  The foregoing Confidential Information and trade secrets would all be highly useful and valuable to Korn Ferry as it reconstituted Spencer Stuart's Russia operations, allowing it to get up and running virtually immediately with replicated Spencer Stuart processes, methodologies, and know-how, without the substantial investment of time, money, and other resources that Spencert Stuart had undertaken to develop this information.  The foregoing Confidential Information and trade secrets would also be useful for Korn Ferry throughout the world, including in the United

States, as it sought to replicate Spencer Stuart's service offerings in practices such as CEO Succession and Leadership Advisory Services, where it has traditionally lagged far behind Spencer Stuart, thus harming and threatening to harm Spencer Stuart's US business, including in its California offices.  This information, however, would have little to no value to Glazunov, Storozhenko, and Koshman after they left Spencer Stuart, except in their capacities as employees and agents of Korn Ferry.

72.    Glazunov, Storozhenko, and Koshman also conspired together – upon information and belief at the behest of Korn Ferry – to secure their 2020 bonuses that would normally have been forfeited upon their departure from Spencer Stuart, in an effort to reduce the financial burden that Korn Ferry was taking on by hiring them.

**D.    At Korn Ferry's Behest, the Spencer Stuart Moscow Consultants and Other Personnel Engage in Coordinated Resignation Waves Designed to Inflict Maximum Disruption Upon Spencer Stuart's Business and Steal More Trade Secrets and Confidential Information**

73.    On Sunday, December 20, 2020, Storozhenko delivered notices of resignations for himself, Glazunov, and Koshman, dated December 18, 2020, to Spencer Stuart's Regional Manager, to be effective January 10, 2021.  The resignation templates had been created by Korn Ferry and provided to Glazunov by Korn Ferry.

74.    On Monday, December 21, 2020, Korn Ferry had Korn Ferry offer letters hand-delivered by Spencer Stuart personnel to seven employees of Spencer Stuart's Moscow Office: Mytsalo, Vanin, Kalkina, Matveeva, Maximova, and Baranova, and Nabatova. ***The offer letters explicitly reference that Glazunov would be the intermediary to receive their acceptances, notwithstanding that he was still employed by and GD of Spencer Stuart at that time.***

75.    The offer letters also reference that Graham Paul would also be a point of contact for them, showing that Korn Ferry's legal department (headed by Kuai in Los Angeles) was directly involved in orchestrating Glazunov's improper conduct.  A copy of these offer letters is attached to the Complaint as Exhibit N.

76.    On information and belief, these letters were generated from Korn Ferry's Los Angeles headquarters.

77.    Once the Spencer Stuart personnel had these offer letters in hand, they were then brought into and made part of Korn Ferry's unlawful plot to steal Spencer Stuart's clients, trade secrets and other Confidential Information.

78.    For example, the very next day, December 22, 2020, Storozhenko's Executive Assistant, Maria Maximova, sent several attachments to her personal email address, including a copy of the trade secrets identified in Paragraph 42 above, as well as Spencer Stuart proprietary model project closing client materials and templates. This trade secret information would be highly useful to Korn Ferry as it reconstituted Spencer Stuart's Russia operations, allowing it to forego years and countless dollars spent in research and development, but otherwise of no use to Storozhenko or Maximova after they left Spencer Stuart except in their capacities as employees and agents of Korn Ferry.

79.    On December 29, 2020, each of the Moscow Associates and Analysts—Kalkina, Vanin, Mytsalo, and Nabatova—gave their coordinated resignations to Spencer Stuart, using resignation forms provided to Glazunov by Korn Ferry.

80.    The very next day, on December 30, 2020, Koshman's Executive Assistant, Svetlana Baranova, sent to her personal email address internal materials on the search administration process, information that overviews Spencer Stuart's proprietary database and applications as well as search process, and model answers to candidates who proactively shared their CVs.  All of the foregoing would be highly useful and valuable to Korn Ferry as it reconstituted Spencer Stuart's Russia operations, allowing it to get up and running virtually immediately with replicated Spencer Stuart processes, methodologies, and know-how, without the substantial investment of time, money, and other resources that Spencert Stuart had undertaken to develop this information.  This information, however, would be of no use to Baranova and Koshman after they left Spencer Stuart other than in their capacities as employees and agents of

1  Korn Ferry.

2      81.    On January 13, 2021, each of the Moscow Consultant's Executive

3  Assistants—Matveeva, Maximova, Baranova—gave their coordinated resignations to

4  Spencer Stuart, using resignation forms provided to them by Korn Ferry.  They had

5  received their offer letters on December 21, 2020, and knew they were leaving Spencer

6  Stuart since no later than that date, but had delayed their resignation date until after the

7  Moscow Consultants left in an effort to conceal the fact that Korn Ferry had orchestrated

8  a simultaneous lift-out of the Moscow officer personnel, trade secrets, and clients in

9  violation of Spencer Stuart's contractual and legal rights.

10      82.    On information and belief, all of the conduct described in this section was

11  orchestrated by Fookson, from Korn Ferry's Los Angeles office, as well as by Kuai,

12  either personally and/or through his direct reports, including Graham Paul.   All

13  substantive operations of Korn Ferry's new Moscow office, including the use of

14  misappropriated trade secrets, are overseen by its Los Angeles global headquarters,

15  which houses the senior leadership of Korn Ferry, including global CEO Gary Burnison,

16  global General Counsel, Kuai, and Fookson.

17      **E.    Korn Ferry Uses Glazunov, Koshman, and Storozhenko to Steal**

18  **Business Opportunities Directed to Spencer Stuart While They Are Employed by**

19  **Spencer Stuart and on Spencer Stuart Payroll**

20      83.    Korn Ferry also knowingly caused, induced and/or allowed Glazunov,

21  Storozhenko, and Koshman to divert business opportunities meant for Spencer Stuart

22  while they remained employees of Spencer Stuart and under contractual duties not to

23  divert business away from Spencer Stuart.  For example:

24      84.    On December 13, 2020, a certain Spencer Stuart client ("Spencer Stuart

25  Client A") contacted the Moscow Office to inquire about who from Spencer Stuart

26  could assist them with a search for their company outside of Russia.

27      85.    On December 15, 2020, Spencer Stuart Client A specifically asked the

28  Moscow Office if it could discuss the project with someone from Spencer Stuart's

1    London office.

2        86.    On December 16, 2020, Glazunov responded by telling Spencer Stuart

3    Client A to contact him on the messaging platform WhatsApp to discuss the company's

4    request.  By directing the client representative to use WhatsApp to discuss the business

5    opportunity, Glazunov evaded Spencer Stuart's systems such that Spencer Stuart would

6    not have a record of the conversation.

7        87.    Glazunov informed no one from Spencer Stuart outside of Moscow about

8    this opportunity.

9        88.    On January 21, 2021, Spencer Stuart learned that Spencer Stuart Client A

10   is now working with Korn Ferry on the project it had inquired about.  On information

11   and belief, Glazunov – while still employed with Spencer Stuart and at Korn Ferry's

12   behest – directed Spencer Stuart Client A to work with Korn Ferry and not Spencer

13   Stuart.

14       89.    On December 17, 2020, a different Spencer Stuart client ("Spencer Stuart

15   Client B") asked Storozhenko to submit a Request for Proposal relating to certain search

16   work opportunities.   Instead of accepting this invitation, Storozhenko declined to

17   participate in the RFP on behalf of Spencer Stuart and instead asked Spencer Stuart

18   Client B to meet with him in person to discuss the opportunity.  Upon information and

19   belief, Storozhenko met with the client and diverted the opportunity to Korn Ferry, at

20   Korn Ferry's behest.  Storozhenko notified no one else at Spencer Stuart about this

21   opportunity, which was uncovered only following investigation.

22       90.    On December 23 and 29, 2020, Storozhenko met with another existing

23   Spencer Stuart client ("Spencer Stuart Client C").  Following these meetings, Spencer

24   Stuart Client C cancelled two open projects with Spencer Stuart.  On December 30,

25   Storozhenko's researcher, Irina Kalkina, forwarded detailed project information for

26   these projects to her personal email address.  Upon information and belief, Storozhenko,

27   at Korn Ferry's behest, diverted these opportunities to Korn Ferry and had Kalkina

28   transfer the Spencer Stuart property and proprietary information to herself (and

henceforth Korn Ferry) in order to facilitate this improper theft of business opportunities from Spencer Stuart.

91.    Likewise, Spencer Stuart's ongoing investigation reveals several other client opportunities that Storozhenko engaged on in December 2020, which were never brought to Spencer Stuart's attention, and which have vanished from Spencer Stuart and were only uncovered in the course of its investigation.

## FIRST CLAIM FOR RELIEF

### (Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836)

92.    Spencer Stuart repeats and restates the allegations in the foregoing paragraphs as if fully set forth herein.

93.    As set forth above, Defendants have improperly acquired, remain in possession of, used, and disclosed certain confidential and proprietary information of Spencer Stuart constituting "trade secrets" as defined by 18 U.S.C. § 1839(3).  These trade secrets, including without limitation those specifically identified above, have been used in and/or were intended for use in interstate and/or foreign commerce.  Spencer Stuart is the owner of such information.

94.    Spencer Stuart has taken numerous, reasonable precautions to protect and to maintain the value of its trade secrets, including without limitation as set forth above. This information is integral to Spencer Stuart's Executive Search practice, CEO Succession practice, and Leadership Advisory Services practice, among others, and is the result of extensive, time-consuming and expensive internal research and development, as well as confidential discussions with clients and candidates.

95.    Spencer Stuart's trade secrets derive actual or potential independent economic value from not being generally known to and not being readily ascertainable through proper means by any other person who can obtain economic value from the disclosure or use of the information. Specifically, the secrecy of the trade secrets protects Spencer Stuart from replication of its know-how and business methodologies in the Executive Search, CEO Succession, and Leadership Advisory Services practices,

among others, thus allowing it to provide unique and highly-valuable service offerings to clients located throughout the world and preventing strategic undercutting and replication by its competitors.

96.     Such proprietary, trade secret and confidential information is not accessible to the public and is not generally known within the trade or by special persons who are skilled in the trade, other than by those who are bound to maintain their secrecy and confidentiality.

97.     The trade secrets represent years of proprietary research, development, and investment by Spencer Stuart.  They were obtained and compiled over time by Spencer Stuart employees using Spencer Stuart resources and know-how.

98.     Defendants' improper acquisition and/or unauthorized use or disclosure violates the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (the "DTSA").

99.     Defendants knew that Glazunov, Koshman, and Storozhenko had contractual and legal duties to refrain from disclosing or using for their benefits, or for the benefits of third parties, Spencer Stuart's trade secrets.  These duties arose from, among other things, Glazunov's duties set forth in the 2017 Glazunov Employment Agreement with Spencer Stuart, Koshman's duties set forth in the Koshman Employment Agreement, Storozhenko's duties set forth in the Storozhenko Employment Agreement, and Russian law applicable to Glazunov, Storozhenko, and Koshman.

100.     Defendants knew or had reason to know that knowledge of the trade secrets were derived through improper means, acquired under circumstances giving rise to a duty to maintain its secrecy or limit the use of the trade secrets, or derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

101.     Defendants' acquisition of Spencer Stuart's trade secrets through improper means was not authorized by Spencer Stuart.

102.     Defendants have improperly acquired, used, and/or disclosed Spencer

1    Stuart's trade secrets with full knowledge that this information was acquired under

2    circumstances giving rise to a duty to maintain its secrecy or limit its use and was

3    acquired by improper means.

4         103.   Defendants' misappropriation and use of Spencer Stuart's trade secrets

5    was intentional, knowing, willful, and oppressive.

6         104.   As a direct and proximate result of Defendants' unlawful, tortious conduct,

7    Spencer Stuart has been damaged and Defendants have been unjustly enriched.  This

8    unjust enrichment includes the value and profits attributed to the misappropriated

9    information, including amounts Defendants saved in research and development costs

10   using the misappropriated information and increased productivity from use of the

11   misappropriated information.

12        105.   Defendants' conduct constitutes willful and malicious misappropriation

13   within the meaning of the DTSA. In wrongfully and intentionally misappropriating

14   Spencer Stuart's trade secrets as outlined above, Defendants have demonstrated specific

15   intent to cause substantial injury or harm to Spencer Stuart. As such, Spencer Stuart is

16   entitled to an award of exemplary and punitive damages as well as an award of its

17   reasonable attorney's fees pursuant to the DTSA.

18        106.   Unless Defendants are enjoined from misappropriating Spencer Stuart's

19   trade secrets, Spencer Stuart will suffer irreparable harm for which there is no adequate

20   remedy at law.

21                      **SECOND CLAIM FOR RELIEF**

22              **(Intentional Interference with Contractual Relations)**

23        107.   Spencer Stuart repeats and restates the allegations in the foregoing

24   paragraphs as if fully set forth herein.

25        108.   As detailed above, Spencer Stuart had valid, enforceable contracts with

26   Glazunov, Koshman, and Storozhenko, in which each of them agreed to remain loyal

27   to Spencer Stuart—*i.e.*, that while they remained employed by Spencer Stuart, they

28   would not solicit their colleagues and underlings to leave Spencer Stuart to join a

competitor and would not divert business away from Spencer Stuart and to its competitors—and in which each of them agreed not to misappropriate Spencer Stuart's trade secrets and other confidential and proprietary information. *See* Exhibits A, B, and D.

109.   Upon information and belief, Korn Ferry was aware of the terms of each of these contracts.  Korn Ferry had existing operations in Russia through its Hay Group subsidiary, and was aware of the terms of standard Russian employment agreements and Russian employment laws.  Korn Ferry's legal department was directly involved in the recruitment of Glazunov, Koshman, and Storozhenko, and had prepared and entered into contracts with them guaranteeing them, in the aggregate, approximately $10,000,000.00 in guaranteed compensation.  Korn Ferry would not have done this without familiarizing itself with the terms of their existing contractual obligations to Spencer Stuart.

110.   Upon information and belief, Korn Ferry was also aware of Glazunov's legal duties of loyalty that arose as a result of his status of General Director.  Having operated its Hay Group subsidiary for approximately six years in Russia, which itself had a legally-required GD, and having a sophisticated international legal department, Korn Ferry would have had the basic familiarity with Russian legal requirements to know that a GD owes a duty of loyalty to the company where he serves as GD (even in the absence of a contract) that would disallow him from soliciting employees, stealing trade secrets, and diverting business opportunities to competitors.

111.   Defendants' actions as described herein prevented and hindered the performance of the contracts.

112.   Defendants intended this result and/or knew it was likely.

113.   As a direct and proximate result of Defendants' actions as described herein, Spencer Stuart has been damaged and continues to be damaged, including in the form of lost profits resulting from the loss of the Moscow personnel and clients and in the form of the value of Spencer Stuart's Moscow operations that was lost as a result of

Defendants' conduct described herein, in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage)

114.   Spencer Stuart repeats the allegations in the foregoing paragraphs as if fully set forth herein.

115.   As described herein, Spencer Stuart was in an economic relationship with the clients and prospective clients described herein—including without limitation Spencer Stuart Client A, Spencer Stuart Client B, and Spencer Stuart Client C—that had a probable future economic benefit or advantage to Spencer Stuart.  Indeed, the clients in question had approached Spencer Stuart about having Spencer Stuart perform services for those clients and/or were actively engaged on projects with Spencer Stuart, both inside and outside of Russia.

116.   Korn Ferry knew of these relationships, having received knowledge of these relationships from Glazunov, Storozhenko, and/or Koshman during the period they remained employed by Spencer Stuart's payroll but were acting on behalf of Korn Ferry, at Korn Ferry's behest.

117.   Korn Ferry intentionally and wrongfully diverted these relationships from Spencer Stuart to Korn Ferry, by using Glazunov, Storozhenko, and Koshman to divert these opportunities to Korn Ferry, with full knowledge that Glazunov, Storozhenko, and Koshman had contractual and/or legal duties to Spencer Stuart that made such conduct wrongful and unlawful.

118.   Korn Ferry's actions in this regard were carried out with the knowledge that the interference was certain or substantially certain to occur as a result of its actions, such that the clients and prospective clients in question would divert their business from Spencer Stuart to Korn Ferry, particularly inasmuch as the only Spencer Stuart personnel made aware of these opportunities were the very same Moscow Consultants that Korn Ferry had working on its behalf.

119.   Such disruption has in fact occurred, as the business opportunities

described herein have been lost by Spencer Stuart, and Spencer Stuart has knowledge of at least one major engagement having already been secured by Korn Ferry as a result of the actions described herein.  Upon information and belief, other client opportunities described herein, as well as others that Spencer Stuart is not yet aware of, are now being handled by Korn Ferry.

120.  As a direct and proximate result of Korn Ferry's wrongful conduct, Spencer Stuart has been harmed and continues to be harmed, including in the form of lost present and future business and business opportunities, in an amount to be proven at trial.

121.  Korn Ferry's conduct is malicious, oppressive, deceitful and/or constituted concealment of material facts known to it with the intent of thereby depriving Spencer Stuart of property or legal rights or otherwise causing injury in conscious disregard of Spencer Stuart's legal rights, to justify an award of exemplary and punitive damages.

### FOURTH CLAIM FOR RELIEF

#### (Negligent Interference with Prospective Economic Advantage)

122.  Spencer Stuart repeats the allegations in the foregoing paragraphs as if fully set forth herein.

123.  As described herein, Spencer Stuart was in an economic relationship with the clients and prospective clients described herein—including without limitation Spencer Stuart Client A, Spencer Stuart Client B, and Spencer Stuart Client C— that had a probable future economic benefit or advantage to Spencer Stuart.  Indeed, the clients in question had approached Spencer Stuart about having Spencer Stuart perform services for those clients and/or were actively engaged on projects with Spencer Stuart, both inside and outside of Russia.

124.  Korn Ferry knew or should have known of these relationships, having received knowledge of these relationships from Glazunov, Storozhenko, and/or Koshman during the period they remained employed by Spencer Stuart's payroll but were acting on behalf of Korn Ferry, at Korn Ferry's behest.

125.   Korn Ferry wrongfully diverted these relationships from Spencer Stuart to Korn Ferry, by using Glazunov, Storozhenko, and Koshman to divert these opportunities to Korn Ferry, with full knowledge that Glazunov, Storozhenko, and Koshman had contractual and legal duties to Spencer Stuart that made such conduct wrongful and unlawful.

126.   Korn Ferry knew or should have known that its actions in this regard would disrupt the economic relationship between Spencer Stuart and the clients and prospective clients in question, such that the clients and prospective clients in question would divert their business from Spencer Stuart to Korn Ferry.

127.   Such disruption has in fact occurred, as the business opportunities described herein have been lost by Spencer Stuart, and Spencer Stuart has knowledge of at least one major engagement having already been secured by Korn Ferry as a result of the actions described herein.  Upon information and belief, other client opportunities described herein, as well as others that Spencer Stuart is not yet aware of, are now being handled by Korn Ferry.

128.   As a direct and proximate result of Korn Ferry's wrongful conduct, Spencer Stuart has been harmed and continues to be harmed, including in the form of lost present and future business and business opportunities, in an amount to be proven at trial.

129.   Korn Ferry's conduct in interfering with Spencer Stuart's prospective economic advantage is grossly negligent and reckless in its disregard of Spencer Stuart's legal rights, so as to justify an award of exemplary and punitive damages.

## FIFTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary Duty)

130.   Spencer Stuart repeats the allegations in the foregoing paragraphs as if fully set forth herein.

131.   Glazunov, Koshman, and Storozhenko owed duties of loyalty to Spencer Stuart, both under their respective employment agreements and, in the case of

Glazunov, under Russian law, including duties not to solicit employees, misappropriate trade secrets and other proprietary information, and not to divert business opportunities during their employment with Spencer Stuart.

132.   Upon information and belief, Defendants were aware of these contractual and legal duties.  Korn Ferry had existing operations in Russia through its Hay Group subsidiary, and was aware of the terms of standard Russian employment agreements and Russian employment laws.  Korn Ferry's legal department was directly involved in the recruitment of Glazunov, Koshman, and Storozhenko, and had prepared and entered into contracts with them guaranteeing them, in the aggregate, approximately $10,000,000.00 in guaranteed compensation.  Korn Ferry would not have done this without familiarizing itself with the terms of their existing contractual obligations to Spencer Stuart.  Further, having operated its Hay Group subsidiary for approximately six years in Russia, which itself had a legally-required GD, and having a sophisticated international legal department, Korn Ferry would have had the basic familiarity with Russian legal requirements to know that a GD owes a duty of loyalty to the company where he is GD (even in the absence of a contract) that would disallow him from soliciting employees, stealing trade secrets, and diverting business opportunities to competitors.

133.   Defendants knowingly and intentionally interference with and induced Glazunov, Koshman, and Storozhenko to breach their duties of loyalty, as described herein.

134.   As a direct and proximate result of Defendants' conduct, Spencer Stuart has been damaged and continues to be damaged, including in the form of lost profits resulting from the loss of the Moscow personnel and clients and in the form of the value of Spencer Stuart's Moscow operations that was lost as a result of Defendants' conduct described herein, in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

**(Unfair Competition Under California Business & Professions Code § 17200)**

135.   Spencer Stuart repeats the allegations in the foregoing paragraphs as if fully set forth herein.

136.   California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

137.   Defendants' business acts and practices as alleged herein constitute ongoing unlawful and unfair activity in violation of California's Unfair Competition Law ("UCL"), as codified in California Business and Professions Code § 17200 et seq.

138.   Defendants' business acts are unlawful and unfair because they induced Spencer Stuarts' employees to violate their employment agreements and to breach their duties of loyalty to Spencer Stuart.  As discussed above, these actions further diverted several of Spencer Stuart's clients to Korn Ferry and constitute intentional interference with Spencer Stuart's prospective economic advantage.

139.   Defendants' unlawful and unfair actions as described herein allowed Korn Ferry to effectively steal Spencer Stuart's business, bypassing all the investment of time and resources that Spencer Stuart undertook to grow the Moscow Office.  This is the epitome of unfair competition, as it disincentives the very sort of investment that Spencer Stuart undertook in the first place.

140.   Furthermore, Defendants' conduct constitutes unlawful and unfair business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200 et seq. because Defendants orchestrated and carried out a course of conduct to disrupt, divert, and steal Spencer Stuart's business by, for example and without limitation:

   a.  Engaging in wrongful conduct that disrupted the economic relationships (both current and prospective) between Spencer Stuart and its clients and employees.   Defendants knew of, or should have known of, the relationships, and (1) engaged in the wrongful conduct intentionally to disrupt the relationships; (2) engaged in the wrongful conduct knowing that disruption of the relationships was certain or substantially certain to occur; and/or (3) failed to act with reasonable care and should have known

that the economic relationships would be disrupted if they failed to act with reasonable care.  This wrongful conduct was a substantial factor in causing Spencer Stuart's financial harm.

b. Interfering with Spencer Stuart's contractual relations with its employees and diverting its clients to Korn Ferry;

c. Inducing Glazunov, Storozhenko, Koshman and others to breach their employment agreements and duties of loyalty to Spencer Stuart by, among other things, diverting business opportunities and employees to Korn Ferry while they remained employed by and under contract with Spencer Stuart; and

d. Other conduct which is presently unknown but will be proven at trial.

141.   Spencer Stuart has been harmed as a result of Defendants' unlawful and unfair business acts and practices.  Spencer Stuart is entitled (a) to recover restitution, including without limitation, all benefits that Defendants received as a result of their unlawful and unfair business acts and practices, and (b) an injunction restraining Defendants from engaging in further acts of unfair competition.

## **PRAYER FOR RELIEF**

WHEREFORE, Spencer Stuart demands judgment as follows:

a.     Preliminarily and permanently restraining and enjoining Defendants, their affiliates, subsidiaries, directors, officers, employees, agents and representatives, and all persons acting in concert with or on their behalf, from:

i.     developing, or continuing to develop, using, marketing or commercializing Spencer Stuart's Confidential Information and/or trade secrets, as well as any other products, services or tools that unlawfully rely on, use or disclose Spencer Stuart's Confidential Information and/or trade secrets without prior authorization of Spencer Stuart; and/or

ii.    disclosing or using any of Spencer Stuart's Confidential Information

1    and/or trade secrets, without prior authorization of Spencer Stuart;

2        b.      For Defendants to return all of Spencer Stuart's Confidential Information,

3    trade secrets, and property Defendants' possession, custody or control, and to destroy

4    all additional electronic copies following the return of such information and property;

5        c.      For an injunction against future harm by disclosure or adverse use;

6        d.      For restitution and disgorgement of Defendants' unjust enrichment, in an

7    amount to be proven at trial, or in the alternative, reasonable royalty;

8        e.      For actual damages against Defendants for misappropriation of trade

9    secrets and for the other unlawful and tortious conduct described herein, including in

10   the form of lost profits resulting from the loss of the Moscow personnel and clients and

11   in the form of the value of Spencer Stuart's Moscow operations that was lost as a result

12   of Defendants' conduct described herein, in an amount to be proven at trial;

13       f.      For an award of punitive damages and/or exemplary damages against

14   Defendants in an amount to be proven at trial;

15       g.      For pre-judgment and post-judgment interest at the maximum legal rate,

16   as applicable, as an element of damages that Spencer Stuart has suffered as a result of

17   Defendants' wrongful acts;

18       h.      For reasonable attorneys' fees and costs incurred herein as allowed by law;

19   and

20       i.      For such other, further and different relief as the Court deems just and

21   proper.

22                              **<u>DEMAND FOR JURY TRIAL</u>**

23       Plaintiffs hereby demand a trial by jury on all issues so triable in accordance

24   with Federal Rule of Civil Procedure 38(b).

25   DATED: March 8, 2021

26

27                              **WINSTON & STRAWN LLP**

28                              By: */s/ Daniel Fazio*
                                    Daniel Fazio (SBN: 243475)

1
2
3
4
5

dfazio@winston.com
Diana Hughes Leiden (SBN: 267606)
dhleiden@winston.com
Deven Taylor Klee (SBN: 323444)
dklee@winston.com
333 South Grand Avenue
Los Angeles, CA 90071-1543
Tel:      (213) 615-1700
Fax:      (213) 615-1750

6
7
8
9

*Attorneys for Plaintiffs*
SSI(US) INC. d/b/a SPENCER STUART,
SPENCER STUART INTERNATIONAL
B.V., SPENCER STUART
INTERNATIONAL IRELAND, LTD.,
AND LIMITED LIABILITY COMPANY
SPENCER STUART INTERNATIONAL

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT